## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ROME DIVISION

CARTERSVILLE MEDICAL           )
CENTER, LLC, DOCTORS           )
HOSPITAL OF AUGUSTA, LLC,      )
PARKRIDGE MEDICAL CENTER,      )
INC. and REDMOND PARK          )
HOSPITAL, LLC                  )        CIVIL ACTION NUMBER
                               )        _____
    Plaintiffs,            )
                               )
v.                             )
                               )
BEAULIEU GROUP, LLC            )
                               )
                               )
    Defendant.             )


## NOTICE OF REMOVAL

TO:  THE HONORABLE JUDGES OF THE UNITED STATES DISTRICT
COURT FOR THE NORTHERN DISTRICT OF GEORGIA, ROME DIVISION

     Pursuant to 28 U.S.C. §§ 1441 & 1446, Defendant Beaulieu Group, LLC

("Beaulieu"), on behalf of itself and the Beaulieu Group, LLC Employment Benefit

Plan, files this Notice of Removal of this action from the Superior Court of

Whitfield County, Georgia to the United States District Court for the Northern

District of Georgia, Rome Division.   In support of this Notice, Beaulieu

respectfully shows the court the following:

1.   This action was commenced on July 7, 2015, under an action captioned *Cartersville Medical Center, LLC, Doctors Hospital Of August, LLC, Parkridge Medical Center, Inc. and Redmind Park Hospital, LLC v. Beaulieu Group, LLC*, Civil Action No. 15-cv-951-B, in the Superior Court of Whitfield County, Georgia (the "Civil Action").  The Civil Action is still pending in the state court.

2.   Beaulieu first received a copy of the Summons and Complaint in the Civil Action, by service or otherwise, on July 13, 2015.  Copies of the Summons, Complaint and attached discovery served on Beaulieu are attached hereto as Exhibit "1".  The documents which comprise Exhibit 1 constitute all process, pleadings, discovery and orders served on Beaulieu in the Civil Action to date.

3.   Removal is timely in this matter in that:

(a)   Pursuant to 28 U.S.C. § 1446(b), Beaulieu is required to file its Notice of Removal within thirty days after service of the Complaint.

(b)   Beaulieu did not receive a copy of the Summons and Complaint in the Civil Action, by service or otherwise, prior to July 13, 2015.

(c)   Pursuant to 28 U.S.C. § 1446(b), Beaulieu must file its Notice of Removal on or before August 12, 2015 (30 days after service of the Complaint).

(d)   Accordingly, Beaulieu, by timely filing its Notice of Removal on or before August 12, 2015, has complied with the provisions of 28    U.S.C. § 1446(b).

4.     Beaulieu, to date, has made no appearance in the Civil Action in State Court.

5.     The Civil Action is one of which this Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 and removal jurisdiction pursuant to 28 U.S.C. § 1441 in that:

> (a)     Despite Plaintiffs' overt attempt to cast the Complaint otherwise, all of their factual allegations and legal claims arise out of and relate to an ERISA plan. Therefore, ERISA governs the alleged dispute and this case raises federal question jurisdiction.  The Complaint asserts a claim to recover benefits or to enforce rights under the terms of an employer-sponsored retirement plan, a copy of which is attached as Exhibit "2," that constitutes an "employee pension benefit plan" which is governed exclusively by the Employee Retirement Income Security Act ("ERISA") 29 U.S.C. § 1001, *et seq*. (the "Beaulieu Plan");

> (b)     The Beaulieu Plan is established or maintained by the employer as defined by ERISA, and Plaintiffs purport to be entitled to benefits under the Beaulieu Plan as defined by ERISA, 29 U.S.C. § 1002(2);

> (c)     Plaintiffs' sole remedy against Beaulieu and/or the Beaulieu Plan, if any, for losses suffered and benefits claimed arises under ERISA, 29 U.S.C. § 1132 (a)(1)(B), and, accordingly, any state law claim for benefits is preempted and displaced by the civil enforcement provision of ERISA, Section 502, 29 U.S.C. § 1132, *Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58 (1987).  Indeed, among other things, Plaintiffs would have no right to assert any claims against Defendant but for a purported assignment of the right to claim benefits that belong to the participants and beneficiaries under the Beaulieu Plan.  Moreover, the resolution of Plaintiffs' claims will depend on review and interpretation of the Beaulieu Plan and will implicate rights and assets belonging to the Beaulieu Plan.  *See,*

*Borrero v. United Healthcare of New York, Inc.*, 610 F.3d 1296, 1302 (11th Cir. 2010);

(d)   This Court has jurisdiction over Plaintiffs' claim for benefits under the civil enforcement provision of ERISA, 29 U.S.C. § 1132(e)(1), which gives this Court jurisdiction without respect to the amount in controversy or the citizenship of the parties; and

(e)   The Civil Action is within the original jurisdiction of this Court pursuant to the provisions of 28 U.S.C. § 1331.

6.   Alternatively, on information and belief, the Civil Action is one in which the Court has diversity of citizenship jurisdiction pursuant to 28 U.S.C. § 1332 and removal jurisdiction pursuant to 28 U.S.C. § 1441 in that:

(a)   On information and belief, Plaintiff Cartersville Medical Center, LLC ("Cartersville") is a limited liability that is wholly owned by HCA Holdings, Inc. ("HCA") and has a principal place of business in Nashville, Tennessee. HCA is a Delaware Corporation with a principal place of business in Nashville, Tennessee. Thus, for purposes of assessing diversity, Cartersville is a citizen of the States of Tennessee and Delaware;

(b)   On information and belief, Plaintiff Doctors Hospital of Augusta, LLC ("Augusta") is a Delaware limited liability that is wholly owned by HCA and has a principal place of business in Nashville, Tennessee. HCA is a Delaware Corporation with a principal place of business in Nashville, Tennessee. Thus, for purposes of assessing diversity, Augusta is a citizen of the States of Tennessee and Delaware.

(c)   On information and belief, Plaintiff Parkridge Medical Center, Inc. ("Parkridge") is a Tennessee corporation with a principal place of business in Nashville, Tennessee. Thus, for purposes of assessing diversity, Parkridge is a citizen of the State of Tennessee.

(d)   On information and belief, Plaintiff Redmond Park Hospital, LLC ("Redmond") is a Georgia limited liability that is wholly owned by HCA and has a principal place of business in Nashville, Tennessee.  HCA is a Delaware Corporation with a principal place of business in Nashville, Tennessee.  Thus, for purposes of assessing diversity, Redmond is a citizen of the States of Tennessee and Delaware.

(e)   Thus, on information and belief, diversity of citizenship exists between all parties properly joined in that they are citizens of different states and the amount in controversy exceeds $75,000;

(f)   Further, it is Beaulieu's good faith belief that the amount in controversy exceeds the jurisdictional amount; and, therefore,

(g)   This action is within the original jurisdiction of the Court pursuant to the provisions of 28 U.S.C. § 1332.

7.   Beaulieu files this Notice of Removal prior to the expiration of thirty (30) days following its receipt of a copy of the Summons and Complaint.

8.   Beaulieu will give written notice to Plaintiffs and will file a Notice of Filing of Notice of Removal with the Clerk of Court for the Superior Court of Whitfield County, Georgia.  Beaulieu attaches a copy of the Notice of Filing of Notice of Removal provided to Plaintiffs as Exhibit "2" and attaches the Notice of Filing of Notice of Removal to the Clerk of Court for the Superior Court of Whitfield County as Exhibit "3" (without duplication of the attached exhibit, which is comprised of this Notice).

WHEREFORE, Beaulieu requests that the Civil Action be removed from the Superior Court of Whitfield County, Georgia to the United States District Court for the Northern District of Georgia, Rome Division.

Respectfully submitted, this the 11th day of August, 2015.

**BAKER DONELSON BEARMAN CALDWELL & BERKOWITZ, PC**

*/s/Steven G. Hall*
Steven G. Hall
Georgia Bar No. 319308
Robert G. Brazier
Georgia bar No. 078918
*Counsel for Defendant*

Monarch Plaza, Suite 1600
3414 Peachtree Road, N.E.
Atlanta, Georgia  30326
Telephone:  404.577.6000
Facsimile:  404.221.6501

## <u>CERTIFICATE OF SERVICE</u>

This will certify service of a copy of the foregoing **<u>DEFENDANT'S</u>**
**<u>NOTICE OF REMOVAL</u>** was filed with the online filing system with the U.S.
District Court for the Northern District of Georgia which will automatically send
email notification to all counsel of record and by U.S. First Class Mail to the
following::

Christopher P. Twyman
**Cox, Byington, Brumlow & Twyman, LLP.**
711 Broad Street,
Rome, Georgia 30161

David A. King
Kinika Young
Alison K Grippo
**Bass, Berrry & Sims, PLC**
150 Third Avenue Sourth, Suite 2800
Nashville, TN 37201

*Counsel for Plaintiffs*

This 11th day of August, 2015.

**BAKER DONELSON BEARMAN**
**CALDWELL & BERKOWITZ, PC**

*/s/Steven G. Hall*
Steven G. Hall
Georgia Bar No. 319308
*Counsel for Defendant*

Monarch Plaza, Suite 1600
3414 Peachtree Road, N.E.
Atlanta, Georgia  30326
Telephone:  404.577.6000
Facsimile:  404.221.6501

7

# EXHIBIT "1"

## IN THE SUPERIOR COURT OF WHITFIELD COUNTY

## STATE OF GEORGIA

CARTERSVILLE MEDICAL CENTER, LLC

DOCTORS HOSPITAL OF AUGUSTA, LLC

PARKRIDGE MEDICAL CENTER, INC. and

REDMOND PARK HOSPITAL, LLC

PLAINTIFFS,

CIVIL ACTION
NUMBER   *15 CJ 951-B*

VS.

BEAULIEU GROUP, LLC

DEFENDANT.

FILED & RECORDED
WHITFIELD COUNTY, GA.
2015 JUL -7  AM 11: 39

CLERK OF SUPERIOR COURT

## SUMMONS

TO THE ABOVE NAMED DEFENDANT:   **BEAULIEU GROUP, LLC**

You are hereby summoned and required to file with the Clerk of said court and serve upon the Plaintiff's attorney, whose name and address is:

CHRISTOPHER P. TWYMAN, ESQ.
COX, BYINGTON, BRUMLOW & TWYMAN, LLP
711 BROAD STREET
ROME, GEORGIA 30161

an answer to the complaint which is herewith served upon you, within 30 days after service of this summons upon you, exclusive of the day of service, in accordance with O.C.G.A. § 32-3-14.

This 1st day of JULY, 2015 .

Clerk of Superior Court

BY *Melica Kendrul*

~~Deputy~~ Clerk

INSTRUCTIONS:  Attach addendum sheet for additional parties if needed, make notation on this sheet if addendum sheet is used.



FILED & RECORDED,
WHITFIELD COUNTY, GA.
2015 JUL -7 AM 11:39
CLERK OF SUPERIOR COURT

IN THE SUPERIOR COURT OF THE STATE OF GEORGIA
WHITFIELD COUNTY

Cartersville Medical Center, LLC,      )
Doctors Hospital of Augusta, LLC,      )
Parkridge Medical Center, Inc., and    )
Redmond Park Hospital, LLC             )
                                       )
            Plaintiffs,                )
                                       )
v.                                     )    Case No. 15CI951-B
                                       )    Jury Trial Demanded
Beaulieu Group, LLC                    )
                                       )
            Defendant.                 )

## COMPLAINT

Plaintiffs hereby submit this complaint for breach of contract against Defendant and would show the Court as follows:

### NATURE OF DISPUTE

This matter concerns the rate of payment Defendant owes Plaintiffs for medical services Plaintiffs provided to members of an employee health benefit plan sponsored and administered by Defendant. Plaintiffs entered into agreements with a third party (Health One Alliance, LLC) to participate in a network of providers, which established the reimbursement rates for medical services provided to patients who accessed the network. Defendant entered into an agreement with Health One Alliance, LLC to access the network of providers, including Plaintiffs, and agreed to pay the established reimbursement rates for covered medical services provided to Defendant's plan members. Plaintiffs provided medical services to Defendant's plan members, as they were contractually obligated to do for all patients with access to the network. The medical services are undisputedly covered under the Defendant's plan, and the reimbursement rates are set forth in certain agreements that are separate and distinct from the plan. The

1

Defendant, however, unilaterally reduced the rates for the medical services that Plaintiffs provided and underpaid the claims, in breach of the agreements.

This suit is not based on denial of coverage promised under any patient's employee benefit plan. Rather, this suit is based on Defendant's separate and independent contractual obligation to pay agreed rates to Plaintiffs under express contracts between Plaintiffs and Health One Alliance, LLC and between Defendant and Health One Alliance, LLC. The Defendant's obligation to pay additional money does not stem from the patient's employee benefit plans and, therefore, Plaintiffs are not suing as the assignees of an employee benefit plan participant or beneficiary.

## JURISDICTION, VENUE, AND APPLICABLE LAW

1.      This Court has jurisdiction over this matter pursuant to O.C.G.A. § 15-6-8.

2.      Venue is proper in this county pursuant to O.C.G.A. § 14-2-510.

3.      Plaintiffs assert only state law claims for declaratory judgment and damages arising from Defendant's breach of contract and implied promise to pay.

4.      Plaintiffs do not assert any claim for benefits arising under an employee benefit plan governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, et seq., ("ERISA") or any other claim based on federal law.

## PARTIES

5.      Plaintiff Cartersville Medical Center, LLC, d/b/a Cartersville Medical Center, is a Georgia limited liability company with its principal office in Nashville, Tennessee.

6.      Plaintiff Doctors Hospital of Augusta, LLC, d/b/a Doctors Hospital Augusta, is a Delaware limited liability company registered as a foreign entity in Georgia with its principal office in Nashville, Tennessee;

2

7.      Plaintiff Parkridge Medical Center Inc., d/b/a Parkridge Medical Center, Parkridge East Hospital and Parkridge West Legacy AR, is a Tennessee corporation with its principal office in Nashville, Tennessee.

8.      Plaintiff Redmond Park Hospital, LLC, d/b/a Redmond Regional Medical Center is a Georgia limited liability company with its principal office is Nashville, Tennessee.

9.      Defendant Beaulieu Group, LLC ("Beaulieu") is a Georgia limited liability company with its principal office in Dalton, Georgia.

10.     Upon information and belief, Defendant is the plan sponsor and plan administrator of the Beaulieu Group, LLC Employee Benefit Plan, which provides healthcare benefits to its employees and their dependents under a medical plan. Therefore, Defendant is the proper party to sue to the extent the agreements at issue were entered into by the Beaulieu Group, LLC Employee Benefit Plan.

11.     Defendant may be served with process by serving its registered agent, Corporation Services Company, 40 Technology Parkway, South #300, Norcross, Georgia 30092.

                                   FACTS

12.     Health One Alliance, LLC ("Health One") serves as a third party administrator for various entities, including self-funded plans. Health One enters into agreements with providers to create networks of preferred providers, and in turn, sells access to the networks to "Approved Plans."

13.     Cartersville Medical Center in Cartersville, Georgia; Doctors Hospital of Augusta in Augusta, Georgia; Parkridge Medical Center, Parkridge East Hospital, and Parkridge West Legacy AR in Chattanooga, Tennessee; and Redmond Regional Medical Center in Rome, Georgia (the "Hospitals") entered into agreements with Health One – the Health One Alliance Hospital Participation Agreement – under which the Hospitals agreed to be participating

providers in Health One's network in exchange for agreed reimbursement rates for medical services provided by the Hospitals to members of Approved Plans (the "Participation Agreement").[1]

14.     Upon information and belief, Beaulieu entered into a contract with Health One to become an Approved Plan so that members of Beaulieu's medical plan could access Health One's network of participating providers, including the Hospitals (the "Network Agreement").

15.     The Hospitals have repeatedly requested a copy of the Network Agreement, but Beaulieu and Health One have refused to provide it.

16.     The Participation Agreement provides that "Health One shall [] enter into Approved Plan Agreements consistent with and in accordance with the terms and conditions of this Agreement..." *See* section 2.10.

17.     Upon information and belief, under the Network Agreement, Beaulieu agreed to reimburse participating providers, including the Hospitals, at the reimbursement rates set forth in Exhibit A to the Participation Agreement for services provided to members of Beaulieu's medical plan.

18.     The Participation Agreement provides that it shall be governed by the laws of the state of Georgia. *See* section 12.3.

19.     In accordance with section 2.10 of the Participation Agreement, the Network Agreement should not contain any term or condition that contradicts the Participation Agreement.

---

[1] The Participation Agreement contains a confidentiality provision, and therefore, the document is not attached hereto. Plaintiff and Health One authorize the disclosure of the parts quoted and described herein, but do not waive confidentiality regarding parts not quoted or disclosed herein.

20. Under the Participation Agreement, the Hospitals are obligated to provide healthcare services to individuals who are members of Approved Plans, including members of Beaulieu's medical plan.

21. Participants and beneficiaries of Beaulieu's medical plan are not parties to the Participation Agreement or the Network Agreement.

22. From November 2010 until October 2013, the Hospitals provided medical services to members of Beaulieu's medical plan who presented at the Hospitals with identification cards that entitled them to access the Health One network in which the Hospitals participate.

23. The Hospitals submitted 52 claims to Beaulieu to be paid at the Participation Agreement rates for the medical services provided to members of Beaulieu's medical plan.

24. To date, Beaulieu has underpaid 50 claims contrary to the Participation Agreement rates.[2]

25. Upon information and belief, contrary to the Network Agreement, Beaulieu disregarded the Participation Agreement rates and unilaterally reduced the rates based on the assertion that the Hospitals' claims included "excessive charge[s]."

26. The medical services provided by the Hospitals were covered services under Beaulieu's medical plan, and Beaulieu has no basis to assert that the Hospitals' services were not covered or deny the claims for reimbursement for any other reason.

27. In fact, Beaulieu deemed all claims at issue to be for covered services under its medical plan when it paid the claims at reduced rates.

---

[2] Plaintiffs will provide to Defendant an electronic copy of a spreadsheet containing the claims at issue, but has not attached the document to its Complaint to protect patient health information from disclosure under state and federal law.

28.      Based on the Participation Agreement rates, Beaulieu owes the total amount of $1,192,011.50 to the Hospitals for services provided to members of Beaulieu's medical plan.

29.      When the Hospitals demanded that Beaulieu pay in accordance with the Participation Agreement and the Network Agreement, Beaulieu asserted that it could unilaterally change the contractual reimbursement rates.

30.      Upon information and belief, Beaulieu was aware of the Participation Agreement rates at the time Beaulieu willingly entered into the Network Agreement.

31.      The Participation Agreement does not allow Beaulieu to unilaterally change the contractual reimbursement rates.

32.      The Participation Agreement states that it "may not be amended or changed in any of its provisions except by a subsequent written agreement signed by the duly authorized representatives of Health One and Hospital..." *See* Section 12.1.  Neither Health One nor the Hospitals executed any written agreement to change the contractual reimbursement rates.

33.      Upon information and belief, the Network Agreement does not allow Beaulieu to unilaterally change the contractual reimbursement rates.

34.      The Hospitals never consented to the unilateral amendment of the contractual reimbursement rates.

35.      Upon information and belief, the Network Agreement was in effect during the period relevant to this dispute, but after this dispute arose, Health One terminated the Network Agreement due to Beaulieu's wrongful conduct.

## COUNT I: DECLARATORY JUDGMENT

36.      Plaintiffs incorporate paragraphs 1 through 35 of this Complaint as if fully set forth herein.

37.     Pursuant to the Declaratory Judgment Act, O.C.G.A. § 9-4-1 to -10, Plaintiffs assert there exists an actual controversy between the parties and seeks a declaration of the parties' rights and obligations.

38.     Plaintiffs seek a declaration that Defendant has an independent legal duty to pay the contractual reimbursement rates that it expressly agreed to pay.

39.     Plaintiffs further seek a declaration that they are entitled to receive the contractual reimbursement rates set forth in the Participation Agreement for services provided to members of Defendant's medical plan.

### COUNT II: BREACH OF THE NETWORK AGREEMENT

40.     Plaintiff incorporates paragraphs 1 through 35 of this Complaint as if fully set forth herein.

41.     To the extent that the Network Agreement is consistent with the Participation Agreement and confers a benefit upon the Hospitals, Plaintiffs assert a claim for breach of the Network Benefit as a third-party beneficiary of that agreement.

42.     The Network Agreement is an enforceable contract between Health One and Defendant.

43.     Each Plaintiff is a third party beneficiary of the Network Agreement, and, as such, is entitled to maintain an action against Defendant as the promisor on the contract pursuant to O.C.G.A. § 9-2-20.

44.     Defendant failed to perform under the Network Agreement by refusing to pay the full amount of the contractual reimbursement rates that it promised to pay to participating providers who provided medical services to members of Defendant's plan, constituting a breach of the Network Agreement by Defendant.

45.     As a result of Defendant's breach, Plaintiffs suffered damages measured as the difference between the amount Defendant has paid and the full amount of the contractual reimbursement rates.

## COUNT III: BREACH OF IMPLIED PROMISE TO PAY/QUANTUM MERUIT
### (Alternatively pled)

46.     Plaintiffs incorporate paragraphs 1 through 35 of this Complaint as if fully set forth herein.

47.     To the extent Defendant is not obligated to pay the Participation Agreement rates or that Plaintiffs are not third-party beneficiaries of the Network Agreement, then there is no express contract governing this matter and Plaintiffs are entitled to quantum meruit based on Defendant's implied promise to pay, pursuant to O.C.G.A. § 9-2-7.

48.     Plaintiffs provided medical services to members of Defendant's medical plan that were medically necessary and reasonable, which were valuable to the Defendant and were accepted.  Under these circumstances, an implied promise to pay the reasonable value of the services arose.

49.     Defendant is obligated to pay the reasonable value of the medical services provided to members of its medical plan based on its role as plan sponsor and plan administrator.

50.     Defendant has partially paid for the services provided to members of its plan, and thus, is estopped from denying its obligation to pay the reasonable value of the services.

51.     Plaintiffs' full billed charges constitute the reasonable value of the services provided.

52.     Defendant has paid less than the reasonable value of the medical services provided by Plaintiffs.

53.     Therefore, Plaintiffs are entitled to an award in the amount of the difference between the amount paid by Defendant and the full billed charges.

WHEREFORE, Plaintiffs pray:

a.   that summons be issued to Beaulieu Group, LLC and returned to Plaintiffs for

     service;

b.   that Plaintiffs have a trial by jury;

c.   that Plaintiffs have declaratory judgment entered in their favor;

d.   that Plaintiffs have final judgment entered against the Defendant for actual

     damages;

e.   that Plaintiffs be awarded their reasonable attorneys' fees against Defendant

     pursuant to contract;

f.   that Plaintiffs recover their court costs; and

g.   for such further relief, at law and in equity, to which this Court may find it is

     entitled.

Dated: July 7, 2015.

                              Respectfully submitted,

                              Cox, Byington, Brumlow & Twyman, LLP

                              By:
                              Christopher P. Twyman, (GA Bar No.720660)
                              711 Broad Street
                              Rome, Georgia  30161
                              P: (706) 291-2002 / F: (706) 291-6242

                              and

                              David A. King (*pro hac vice* application pending)
                              Kinika L. Young (*pro hac vice* application pending)
                              Alison K. Grippo (GA Bar No. 110282)
                              Bass, Berry & Sims PLC
                              150 Third Avenue South, Suite 2800
                              Nashville, TN 37201
                              P: (615) 742-7200 / F: (615) 742-2792

                              *Counsel for Plaintiffs*

13729702.7



IN THE SUPERIOR COURT OF THE STATE OF GEORGIA
WHITFIELD COUNTY

| | | |
|---|---|---|
| Cartersville Medical Center, LLC, | ) | |
| Doctors Hospital of Augusta, LLC, | ) | |
| Parkridge Medical Center, Inc., and | ) | |
| Redmond Park Hospital, LLC | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 15CI951-B |
| | ) | Jury Trial Demanded |
| Beaulieu Group, LLC | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFFS' FIRST SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS

Pursuant to the Georgia Civil Practice Act (O.C.G.A. §§ 9-11-26, 9-11-33 and 9-11-34), Plaintiffs request that Defendant, Beaulieu Group, LLC, ("Beaulieu") respond to the following interrogatories and produce the documents specified for production herein within forty-five (45) days from the date of service for inspection and copying at the office of counsel for Plaintiffs, David A. King, Bass, Berry & Sims PLC, 150 Third Avenue South, Suite 2800, Nashville, TN 37201. These requests are continuing and require supplemental responses to the extent provided by O.C.G.A. § 9-11-26(e). The following instructions and definitions are applicable to all requests for production herein.

## INSTRUCTIONS

A.    These interrogatories and requests for production call for all information, documents, and things that are known or available to Beaulieu, including all information, documents, and things in the possession of or available to Beaulieu's agents, attorneys, employees, employers, officers, directors, representatives, investigators, or any other person

acting on behalf of Beaulieu or under the direction or control of Beaulieu or its attorneys or agents.

B.    All documents requested are to be produced in the same file or other organizational environment in which they are maintained.  For example, a document that is part of a file, docket, or other grouping, should be physically produced together with all other responsive documents from said file, docket or grouping, in the same order or manner of arrangement as the original.  Alternatively, as to each document and thing produced in response hereto, Beaulieu shall identify the request for production in response to which the document or thing is being produced.

C.    Each interrogatory and document request calls for not only information and documents in Beaulieu's possession, custody and control, but also all information, documents, and things that are available to Beaulieu by reasonable inquiry and due diligence.

D.    Where an interrogatory or a document request calls for the identification of a document or communication that is in writing, it includes drafts and marked copies thereof and encompasses such documents and written communications within the custody, possession, or control of Beaulieu's agents, including, but not limited to, Beaulieu's counsel.

E.    If Beaulieu withholds responses to interrogatories, documents, or things responsive, in whole or in part, to any request for production on the basis of privilege or immunity from discovery: (1) identify the nature of the privilege or immunity asserted; and (2) provide a statement setting forth all facts relied upon in support of the claims of privilege or immunity, including without limitation, the dates, authors, recipients, title, subject matter and present location of the involved documents and things.

F.   .   If Beaulieu refuses to respond to any request for production based on the claim that any of the documents requested have been destroyed or otherwise discarded, please identify the relevant documents or things and thoroughly explain the circumstances which led. to the destruction or discarding.

## DEFINITIONS

The following terms are defined as follows for the purposes of all interrogatories and document requests herein unless otherwise expressly defined within an interrogatory or document request.

A.      The term "Beaulieu" refers to Defendant, Beaulieu Group, LLC, its predecessors, and other business entities related to it, including the Beaulieu Group, LLC Employee Benefit Plan, parent companies, subsidiaries and divisions, as well as Beaulieu's agents, attorneys, employees, and other persons acting on Beaulieu's behalf.

B.   .   The term "the Hospitals" refers to Cartersville Medical Center in Cartersville, Georgia; Doctors Hospital of Augusta in Augusta, Georgia; Parkridge Medical Center, Parkridge East Hospital, and Parkridge West Legacy AR in Chattanooga, Tennessee; and Redmond Regional Medical Center in Rome, Georgia.

C.      The term "Health One" refers to Health One Alliance, LLC, a third party administrator for various entities, including self-funded plans, as well as Health One's agents, attorneys, employees, and other persons acting on behalf of Health One.

D.      The term "AMPS" refers to Advanced Medical Pricing Solutions, as well as AMPS's agents, attorneys, employees, and other persons acting on behalf of AMPS.

E.      The term "Participation Agreement" refers to the Health One Alliance Hospital Participation Agreement – under which the Hospitals agreed to be participating providers in

3

Health One's network in exchange for agreed reimbursement rates for medical services provided by the Hospitals to members of approved plans.

F.    The term "Network Agreement" refers to the contract Beaulieu entered into with Health One to become an Approved Plan, allowing members of Beaulieu's health insurance plan to access Health One's network of participating providers, including the Hospitals.

G.    The terms "communication" or "communications" shall mean any transmission of information by oral, graphic, written, pictorial, or otherwise perceptible means, including without limitation, telephone conversations, letters, electronic mail, memoranda, telegrams, meetings, and in-person conversations.

H.    The terms "document" or "documents" are used in the most comprehensive and inclusive sense permitted by O.C.G.A. § 9-11-34 and refer to all written, recorded or graphic matter (including all drafts, originals, and nonconforming copies that contain deletions, insertions, handwritten notes, or comments of any kind), however produced or reproduced to any tangible or intangible, permanent or temporary, and, without limitation, shall include all correspondence, letters, electronic mail, telephone logs, telegrams, teletypes, telexes, interoffice communications, computer data, records of conferences or meetings, memoranda, notes, books, pamphlets, newsletters, speeches, newspaper or magazine articles, press releases, agreements, banking and financial records, files, calendars, bills, invoices, orders, policies, summaries, opinions, investigation statements or reports, schedule, manual, record, study, electronic documents, voice recordings, video and audio recordings, photographs, films, tapes, online website content and other data compilations and forms of communication, however produced.

I.    References to the terms "or" and "and" shall be interpreted in their broadest sense and shall include both the disjunctive and the conjunctive application of the terms.

4

J.     The terms "person" and "persons" mean any natural person or legal entity (i.e., corporations or other business entities). Unless noted otherwise, references to any person, entity or party include its, his or her agents, attorneys, employees, employers, officers, directors representatives, investigators, or others acting on behalf of said person, entity or party.

K.     The terms "relates to," "relating to," or "related to" mean constitutes, contains, records, discusses, summarizes, discloses, and/or refers to, in whole or in part.

L.     The terms "you" or "your" refer to Beaulieu and its agents, employees, and representatives.

M.     Terms used in the singular shall be deemed to include the plural and terms used in the masculine shall be deemed to include the feminine, and vice versa.

N.     The terms "identify" and "state the identity of":

1.     when used in reference to a natural person, mean to state his or her (i) full name, (ii) present or last known residential address, (iii) present or last known business affiliation and position (including a description of his or her duties and responsibilities) at the time or during the period of time at question, (iv) and telephone numbers, both land and cellular;

2.     when used in reference to a corporation, partnership, firm, association, or other business organization, mean to state the full name and principal address thereof;

3.     when used in reference to a communication or document, mean to state whether the communication was oral or written, and if an oral communication, to (i) state the date, time, place (or places, if it was by telephone) and mode thereof, (ii) identify each person making and/or receiving it and each other person who was present (in person, conference, by telephone or otherwise) when it was made, and (iii) state the

5

nature, subject matter and substance thereof; or if a written communication, to (i) state the date, nature (e.g., letter, memorandum, contract, etc.), subject matter and substance thereof, (ii) identify the author or authors (and, if different, the signer and signers) thereof, (iii) identify the addressee or addressees (and, if different, the recipient or recipients, including all persons who received copies) thereof, and (iv) state the present location and identify the custodian or custodians thereof. In lieu of stating the substance of a written communication or document, a true, complete, and legible copy thereof may be attached to the answers to the interrogatories.

## INTERROGATORIES

### Interrogatory No. 1

Identify all communications between Beaulieu and Health One concerning the reimbursement of participating providers under the Network Agreement, such as the Hospitals.

### Interrogatory No. 2

Identify all communications between Beaulieu and AMPS concerning the reimbursement of participating providers under the Network Agreement, such as the Hospitals.

### Interrogatory No. 3

Identify by name and job title every individual, including but not limited to any employee or agent of Beaulieu, AMPS, or Health One, involved in any communication concerning the reimbursement of participating providers under the Network Agreement, including the Hospitals, and describe the nature and extent of the involvement and role of the respective individual(s) in such communications.

### Interrogatory No. 4

Identify any and all bases or grounds that purportedly authorize Beaulieu to adjust the reimbursement rate or pay to the Hospitals any reimbursement rate for medical services that

differs from the reimbursement rates established under the Participation Agreement for services provided to members of Beaulieu's medical plan.

<u>Interrogatory No. 5</u>

Identify all facts and documents that purport to show that the reimbursement rates established under the Participation Agreement do not constitute "usual and reasonable" rates for such medical services.

<u>Interrogatory No. 6</u>

Identify all persons you expect to offer expert testimony at trial in the above-captioned litigation and state the following:

(a)    The subject matter on which the expert is expected to testify;

(b)    The substance of the facts and opinions to which the expert is expected to testify;

(c)    A summary of the grounds for each opinion;

(d)    The expert's qualifications (including publications authored in the previous ten years);

(e)    A list of all other cases in which, during the previous four years, the witness testified as an expert; and

(f)    A statement of the compensation to be paid for the expert's study and testimony in this case.

<u>Interrogatory No. 7</u>

For the period beginning January 1, 2005 to present, please list all lawsuits or arbitrations in which Beaulieu was named a defendant or respondent, and in which a health care provider asserted a claim related to reimbursement rates.

## REQUESTS FOR PRODUCTION OF DOCUMENTS

**Request No. 1**

The Network Agreement between Beaulieu and Health One.

**Request No. 2**

All documents and communications, including but not limited to communications involving Beaulieu employees or agents, Health One, AMPS, or any third party, relating to reimbursement of participating providers under the Network Agreement.

**Request No. 3**

All documents and communications, including but not limited to communications involving Beaulieu employees or agents, Health One, AMPS, or any third party, relating to reimbursement rates for medical services provided by the Hospitals.

**Request No. 4**

All documents and communications between Beaulieu and any member of the Beaulieu Group, LLC Employee Benefit Plan relating to the Hospitals and/or reimbursement for medical services provided by the Hospitals.

**Request No. 5**

All meeting agendas and minutes for any meetings involving Beaulieu, Health One, and/or AMPS related to reimbursement rates for medical services provided by the Hospitals under the Network Agreement.

**Request No. 6**

All documents and communications you claim give Beaulieu authority to adjust the reimbursement rate or pay any reimbursement rate for medical services to the Hospitals that differs from the reimbursement rates established under the Participation Agreement for services provided to members of Beaulieu's medical plan.

8

**Request No. 7**

All documents referred to or relied upon in answering the Interrogatories served by Plaintiffs. Please indicate which documents are related to which Interrogatory.

**Request No. 8**

All documents which relate to or support any alleged defense of Beaulieu to the claims asserted by Plaintiffs in their Complaint in the above-captioned litigation.

Dated: July 7, 2015

Respectfully submitted,

Cox, Byington, Brumlow & Twyman, LLP

By: _____
Christopher P. Twyman (GA Bar No.720660)
711 Broad Street
Rome, Georgia 30161
P: (706) 291-2002 / F: (706) 291-6242

and

David A. King (*pro hac vice* application pending)
Kinika L. Young (*pro hac vice* application pending)
Alison K. Grippo (GA Bar No. 110282)
Bass, Berry & Sims PLC
150 Third Avenue South, Suite 2800
Nashville, TN 37201
P: (615) 742-7200 / F: (615) 742-2792

*Counsel for Plaintiffs*

13876868.3

9

COPY

IN THE SUPERIOR COURT OF THE STATE OF GEORGIA
WHITFIELD COUNTY

| Cartersville Medical Center, LLC, | ) |
| Doctors Hospital of Augusta, LLC, | ) |
| Parkridge Medical Center, Inc., and | ) |
| Redmond Park Hospital, LLC | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| Beaulieu Group, LLC | ) |
| | ) |
| Defendant. | ) |

Case No. 15 CI 451-B
Jury Trial Demanded

FILED & RECORDED
WHITFIELD COUNTY, GA.
2015 JUL -7 AM 11:40
CLERK OF SUPERIOR COURT

**CERTIFICATE OF SERVICE OF PLAINTIFFS' FIRST SET OF INTERROGATORIES
AND REQUESTS FOR PRODUCTION OF DOCUMENTS**

I, Christopher P. Twyman, hereby certify that I have this day served a copy of the

within and forgoing Plaintiffs' First Set of Interrogatories and Requests for Production of

Documents upon the Defendant by serving a copy of the same with the Complaint for

Damages on the Defendant's Registered Agent,

> Corporation Services Company
> 40 Technology Parkway
> South #300
> Norcross, Georgia 30092

The originals of said Plaintiffs' First Set of Interrogatories and Requests for Production

of Documents are being held in Plaintiffs' file at Cox, Byington, Brumlow & Twyman,

LLP.

This 7th day of July, 2015.

1

Respectfully submitted,

Cox, Byington, Brumlow & Twyman, LLP

By:_____
Christopher T. Twyman (GA Bar No. 720660)
711 Broad Street
Rome, Georgia  30161
P: (706) 291-2002 / F: (706) 291-6242

and

David A. King (*pro hac vice* application pending)
Kinika L. Young (*pro hac vice* application pending)
Alison K. Grippo (GA Bar No. 110282)
Bass, Berry & Sims PLC
150 Third Avenue South, Suite 2800
Nashville, TN 37201
P: (615) 742-7200 / F: (615) 742-2792

*Counsel for Plaintiffs*

2

SHERIFF'S ENTRY OF SERVICE | SC-85-2 | 58021 CLYDE CASTLEBERRY CO., COVINGTON, GA 30015

| | |
|---|---|
| Civil Action No. _____ 15CI-951-B | Superior Court ☒  Magistrate Court ☐ |
| | State Court ☐  Probate Court ☐ |
| Date Filed _____ 07/07/2015 | Juvenile Court ☐ |
| | Georgia, __ WHITFIELD _____ COUNTY |

Attorney's Address
CHRISTOPHER P. TWYMAN, ESQ.
COX, BYINGTON, BRUMLOW & TWYMAN, LLP
711 BROAD STREET
ROME, GA 30161
(706) 291-2002

CARTERSVILLE MEDICAL CENTER, LLC,
DOCTORS HOSPITAL OF AUGUSTA, LLC,
PARKRIDGE MEDICAL CENTER, INC. and
REDMOND PARK HOSPITAL, LLC        Plaintiff

VS.

Name and Address of Party to be Served.

BEAULIEU GROUP, LLC

BEAULIEU GROUP, LLC
c/o CORPORATION SERVICES COMPANY
40 TECHNOLOGY PARKWAY
SOUTH #300
NORCROSS, GWINNETT CO, GEORGIA 30092
                                        Defendant

☆☆REQ FOR INTERROGATORIES AND REQ FOR PRODUCTION☆☆        Garnishee

## SHERIFF'S ENTRY OF SERVICE

**PERSONAL** ☐ I have this day served the defendant _____ personally with a copy of the within action and summons.

**NOTORIOUS** ☐ I have this day served the defendant _____ by leaving a copy of the action and summons at his most notorious place of abode in this County.

Delivered same into hands of _____ described as follows:
age, about _____ years; weight _____ pounds; height, about _____ feet and _____ inches, domiciled at the residence of defendant.

**CORPORATION** ☒ Served the defendant BEAULIEU GROUP, LLC _____ a corporation by leaving a copy of the within action and summons with BERRY SMITH .RA _____ in charge of the office and place of doing business of said Corporation in this County.

**TACK & MAIL** ☐ I have this day served the above styled affidavit and summons on the defendant(s) by posting a copy of the same to the door of the premises designated in said affidavit, and on the same day of such posting by depositing a true copy of same in the United States Mail, First Class in an envelope properly addressed to the defendant(s) at the address shown in said summons, with adequate postage affixed thereon containing notice to the defendant(s) to answer said summons at the place stated in the summons.

**NON EST** ☐ Diligent search made and defendant _____ not to be found in the jurisdiction of this Court.

This 13 day of JULY , 20 15

_____
50327                                    DEPUTY

SHERIFF DOCKET _____ PAGE _____

WHITE-CLERK    CANARY-PLAINTIFF    PINK-DEFENDANT

# EXHIBIT "2"

# BEAULIEU GROUP, LLC

## EMPLOYEE WELFARE BENEFITS PLAN

### Effective as of January 1, 2001

### Amended and Restated as of January 1, 2007

# BEAULIEU GROUP, LLC
## EMPLOYEE WELFARE BENEFITS PLAN

Beaulieu Group, LLC (the "Company"), a limited liability company organized under the laws of the State of Georgia, hereby adopts the Beaulieu Group, LLC Employee Welfare Benefits Plan (the "Plan"), effective as of January 1, 2001, to provide medical, dental, short and long term disability, life insurance and such other welfare benefits as may be described herein and in the exhibits to the Plan. This Plan is a continuation and consolidation of the employee welfare benefit plans maintained by the Company before January 1, 2001. References in the Plan to the Company shall include references to the Company and any predecessor or successor of the Company.

## TABLE OF CONTENTS

ARTICLE 1 DEFINITIONS.................................................................................1

    1.1     Administrator. ...............................................................................1

    1.2     Benefit Program. ...........................................................................1

    1.3     Benefit Provider. ...........................................................................1

    1.4     COBRA Participant. ......................................................................1

    1.5     Code. ...............................................................................................1

    1.6     Company. ........................................................................................1

    1.7     Contract...........................................................................................1

    1.8     Dependent. .....................................................................................1

    1.9     Effective Date. ...............................................................................3

    1.10    Eligible Employee..........................................................................3

    1.11    ERISA. ...........................................................................................3

    1.12    FMLA. ............................................................................................3

    1.13    Medicare. .......................................................................................3

    1.14    Participant. .....................................................................................3

    1.15    Plan. ...............................................................................................3

    1.16    Plan Year........................................................................................3

    1.17    Qualifying Event............................................................................3

    1.18    USERRA........................................................................................3

ARTICLE 2 PARTICIPATION .........................................................................4

    2.1     Eligibility and Participation. .........................................................4

    2.2     Modifying and Revoking Elections. .............................................4

    2.3     Termination of Coverage. .............................................................6

    2.4     COBRA...........................................................................................6

    2.5     Continuation of Coverage During FMLA.....................................6

    2.6     Military Leave.................................................................................7

ARTICLE 3 BENEFITS .....................................................................................8

i

3.1    Coverage. ...................................................................................8

3.2    Contributions. .............................................................................8

3.3    Payment to Benefit Providers. .....................................................8

3.4    Source of Payment. .....................................................................8

3.5    Coordination of Benefits. ............................................................8

ARTICLE 4 ADMINISTRATION OF THE PLAN .......................................10

4.1    Administrator. ...........................................................................10

4.2    Powers and Duties of Administrator. ..........................................10

4.3    Examination of Records. ............................................................11

4.4    Nondiscriminatory Exercise of Authority ....................................11

4.5    Reliance on Tables, etc. .............................................................11

4.6    Compensation of Administrator. .................................................11

4.7    Bonding. ....................................................................................11

4.8    Payment of Administrative Expenses. .........................................11

4.9    Claims Procedure. ......................................................................11

4.10   Qualified Medical Child Support Orders. ....................................11

4.11   Funding Policy. ..........................................................................11

4.12   Indemnification of Certain Fiduciaries. ......................................11

4.13   Erroneous Payments. .................................................................12

4.14   Subrogation and Reimbursement. ...............................................12

4.15   No Assignment of Benefits. ........................................................13

ARTICLE 5 AMENDMENT AND TERMINATION ....................................14

5.1    Amendment of Plan. ..................................................................14

5.2    Termination of Plan. ..................................................................14

5.3    Effective Date of Amendment or Termination. ............................14

ARTICLE 6 MISCELLANEOUS ..............................................................15

6.1    Limitation of Rights. ..................................................................15

6.2    Information to be Furnished. .......................................................15

6.3    Non-alienation of Benefits. .........................................................15

6.4    Payments to Beneficiary. ............................................................15

ii

6.5     Plan Not a Contract of Employment. ................................................................15

6.6     Addresses, Notice, Wavier of Notice. ..............................................................15

6.7     Severability. ......................................................................................................15

6.8     Headings. ..........................................................................................................15

6.9     Lost Distributees. .............................................................................................16

6.10    Proof of Claim. .................................................................................................16

6.11    Governing Law. ................................................................................................16

6.12    Gender and Number. ........................................................................................16

6.13    Payment for Benefit of Incompetent. ...............................................................16

6.14    Provisions of Plan to Control. ..........................................................................16


ARTICLE 7 HIPAA PRIVACY ............................................................................................17

7.1     General. .............................................................................................................17

7.2     Definitions. ........................................................................................................17

7.3     Responsible Employees. ...................................................................................19

7.4     Permitted Uses and Disclosures. ......................................................................20

7.5     Certification Requirement. ...............................................................................21

7.6     Mitigation. .........................................................................................................22

iii

AO 372875.1
1-PH/2543663.3

# ARTICLE 1
## DEFINITIONS

The following terms, when used in the Plan, have the meaning set forth in this Article unless the content clearly indicates another meaning.

**1.1**    *Administrator.*  The term Administrator shall mean the Company or such other person, committee of persons or entity acting on behalf of the Company to whom the Company has delegated the authority to administer any aspect of the Plan pursuant to Article 4.

**1.2**    *Benefit Program.*  The term Benefit Program shall mean any plan, program, insurance policy or arrangement providing medical, health, hospitalization, dental, vision, pharmacy, life insurance, accidental death and dismemberment, long-or-short-term disability, employee assistance or severance benefit that is utilized by this Plan.  In addition to the benefits utilized by the Plan, for purposes of Section 3.5, the term "Benefit Program" shall also include benefits provided to Participants or Dependents under any other arrangement of coverage, including governmental programs.  The Benefit Programs utilized by this Plan are identified in Exhibit 1, are attached hereto and are made a part hereof by reference.

**1.3**    *Benefit Provider.*  The term Benefit Provider shall mean any insurance company or other person or entity contractually obligated to provide benefits under a Benefit Program utilized by the Plan, including the Company, as applicable.

**1.4**    *COBRA Participant.*  The term COBRA Participant shall mean a Participant or Dependent who (a) on the day before a Qualifying Event occurs has health coverage under the Plan and (b) has elected to continue such coverage under Article 2 of the Plan.

**1.5**    *Code.*  The term Code shall mean the Internal Revenue Code of 1986, as amended.

**1.6**    *Company.*  The term Company shall mean Beaulieu Group, LLC and any successor business organization if such successor adopts the Plan.

**1.7**    *Contract.*  The term Contract shall mean any agreement between the Company and any Benefit Provider relating to the provision of any Benefit Program to Participants and Dependents under the Plan.

**1.8**    *Dependent.*  The term Dependent shall mean an Eligible Employee's:

(a)    lawful spouse, determined in accordance with the laws of the Eligible Employee's state of domicile, of the opposite sex who is not legally separated or divorced from the Eligible Employee;

(b)    never-married dependent child under the age of 19 who (i) receives over 80% of his support from the Eligible Employee for that Plan Year, (ii) shares the Eligible Employee's principal place of abode for more than one-half of the year in a regular parent/child relationship (temporary absences due to special circumstances, including absences due to illness, education or vacation are not treated as absences) and (iii) could be claimed as a deduction on the Eligible Employee's federal income tax return (without regard to the child's gross

income);

(c)    never-married dependent child under age 25 who (i) receives over 80% of his support from the Eligible Employee for that Plan Year, (ii) is a registered student in regular full-time attendance at an accredited college, university or approved vocational trade school, (iii) shares the Eligible Employee's principal place of abode for more than one-half of the year in a regular parent/child relationship (temporary absences due to special circumstances, including absences due to illness, education or vacation are not treated as absences) and (iv) could be claimed as a deduction on the Eligible Employee's federal income tax return (without regard to the child's gross income);

(d)    never-married dependent child, regardless of age, who (i) is incapable of supporting himself because of a mental or physical incapacity, (ii) receives over 50% of his support from the Eligible Employee for that Plan Year, (iii) began to experience the incapacity at a time when he satisfied the eligibility criteria under either (b) or (c) above, (iv) is certified by a medical doctor as mentally or physically incapacitated and such certification is accepted by the Plan; (v) shares the Eligible Employee's principal place of abode for more than one-half of the year in a regular parent/child relationship (temporary absences due to special circumstances, including absences due to illness, education or vacation are not treated as absences), (vi) has had continuous coverage under the Plan from the date the incapacity occurred and (vii) could be claimed as a deduction on the Eligible Employee's federal income tax return (without regard to the child's gross income); and

(e)    dependent child who satisfies the criteria of (b) or (c) above during the term of a "Qualified Medical Child Support Order" (as defined under ERISA) that requires the Eligible Employee to provide medical benefits offered under the Plan.

Notwithstanding the foregoing, in the case of a child who is not the Eligible Employee's natural child, the child will not be considered a "Dependent" if they have health coverage available through their natural parent's benefit program.

For purposes of this section, child means a natural child, a legally adopted child, a child placed for adoption or a stepchild. A divorced child does not qualify as an unmarried dependent child. To the extent that the definition of Dependent herein is inconsistent with the terms of any of the Benefit Programs listed on Exhibit 1, the definition of Dependent in the Benefit Program shall control.

Written verification of student status is required for two (2) semesters or three (3) quarters of the school year (whichever is applicable).

Any child to whom Code section 152(e) applies shall be treated as a dependent of both parents.

For purposes of paragraph (d) above, the Eligible Employee must apply for continued coverage within 31 days of the date the child would otherwise cease to meet the definition of "Dependent" under paragraph (b) or (c) above.

Notwithstanding the foregoing, in no event shall a spouse or child be considered a "Dependent" if they reside outside the United States.

     **1.9**    *Effective Date.*  The term Effective Date shall mean the effective date of this restated Plan, which is January 1, 2003.

     **1.10**   *Eligible Employee.*  The term Eligible Employee shall mean any person who is an active full-time employee of the Employer (as characterized under the employment policies of the Employer in effect from time to time), who is working on a scheduled normal work week of at least 30 hours, but excluding (a) persons working for any subsidiary or affiliate of the Company unless such subsidiary or affiliate has become an adopting Employer of the Plan, (b) such persons whose employment is governed by a collective bargaining agreement to the extent such agreement does not provide for participation under this Plan and (c) such persons who are non-resident aliens and who receive no earned income from the Employer which constitutes income from sources within the United States.  Any Employee who is on an approved leave of absence from the Employer may continue to participate in the Plan in accordance with the terms of the Benefit Programs, except as otherwise specified in the Employer's leave of absence policy.  Notwithstanding any provision of this Plan to the contrary, any temporary employee, independent contractor of the Employer or leased employee shall not be an Employee.  In the event that an independent contractor or leased employee is later reclassified as a common law employee by the Employer or by the Internal Revenue Service, other governmental agency or a court, such person, for purposes of this Plan, shall be deemed an Eligible Employee from the later of the actual or the effective date of such reclassification.

     **1.11**   *ERISA.*  The term ERISA shall mean the Employee Retirement Income Security Act of 1974, as amended.

     **1.12**   *FMLA.*  The term FMLA shall mean the Family and Medical Leave Act of 1993, as amended.

     **1.13**   *Medicare.*  The term Medicare shall mean hospital insurance and other health insurance provided in Part "A" and Part "B," respectively, of Title XVIII of the Social Security Act.

     **1.14**   *Participant.*  The term Participant shall mean an Eligible Employee who has met the eligibility and participation requirements set forth in Article 2 and who is enrolled in a Benefit Program utilized by the Plan and shall include a COBRA Participant.

     **1.15**   *Plan.*  The term Plan shall mean the Beaulieu Group, LLC Employee Welfare Benefits Plan as set out in this document, the documents describing the Benefit Programs listed on Exhibit 1 and the Contracts.

     **1.16**   *Plan Year.*  The term Plan Year shall mean the fiscal year on which the records of the Plan are kept, which is presently the 12-month period ending each December 31.

     **1.17**   *Qualifying Event.*  The term Qualifying Event shall mean one of the events enumerated in Code section 4980B(f)(3) that, but for the continuation coverage provided under the Plan as required by Code section 4980B, would result in the loss of health coverage under the Plan for a Participant or a Dependent.

     **1.18**   *USERRA.*  The term USERRA means the Uniformed Services Employment and Reemployment Rights Act of 1994, as amended.

## ARTICLE 2
## PARTICIPATION

2.1     *Eligibility and Participation*. Eligible Employees are eligible to participate in the Plan, and Dependents are eligible for benefits under the Plan only as provided in the Benefit Programs. Eligible Employees shall become Participants and coverage for Dependents shall commence at the times specified in the Benefit Programs.  Eligible Employees shall follow such enrollment processes required for participation in the Benefit Programs as the Plan Administrator shall determine from time to time.

If an Eligible Employee fails to complete the enrollment process for the 2007 plan year, he or she will receive no medical or dental coverage for 2007 and will be able to elect coverage only as permitted under Section 2.2.

If an Eligible Employee fails to complete the enrollment process for the 2008 plan year, his or her medical and dental elections will default to the election in effect on December 31, 2007 (including an election of no coverage), and he or she will be able to change that election only as permitted under Section 2.2.

The Administrator may terminate the participation of any Participant or Dependent with respect to whom the Administrator discovers has engaged in fraud or provided fraudulent information in connection with any Plan matter.  In addition, no benefits shall be payable for fraudulent claims.  Fraud includes the intentional misrepresentation, falsification, concealment or exaggeration of facts and circumstances to receive benefits from the Plan.

2.2     *Modifying and Revoking Elections*.  Except as provided in subparagraphs (a) through (d) below, a Participant's election made under this Article shall be irrevocable after it is filed with the Administrator; provided, however, that if a Participant fails to make required contributions, his or her election will be deemed to have been revoked, and benefits shall cease.

(a)     Change in Status.  A Participant may revoke his or her election for the Plan Year and make a new election if he or she experiences a Change in Status and the election change is consistent with the Change in Status.  An election change must be on account of, and correspond with, a Change in Status that affects eligibility for coverage under said Benefit Program.  The Administrator shall comply with applicable law and regulations in determining whether the Participant's new election is consistent with his or her Change in Status.  For this purpose, a "Change in Status shall mean one of the following events, as well as any other event included under subsequent changes to regulations issued under Code section 125 which the Administrator (in its sole discretion) decides to recognize on a uniform and consistent basis:

(i)     an event that changes the Participant's legal marital status, including marriage, death of the Participant's spouse or divorce;

(ii)    a change in the number of the Participant's Dependents, including the birth, adoption, placement for adoption (as defined under the Health Insurance Portability and Accountability Act ("HIPAA")) or death of a Dependent;

(iii)   any change in employment status of the Participant or the Participant's

Dependent that affects benefit eligibility under a Benefit Program, including: the termination or commencement of employment; strike or lockout; the commencement of or return from an unpaid leave of absence; or a change in employment status that causes the individual to become or cease to be eligible under a Benefit Program (e.g., switching from part-time to full-time status or vice versa, or a similar change if such change causes the individual to lose eligibility for coverage);

(iv)   an event that causes the Participant's Dependent to satisfy or cease to satisfy the eligibility requirements for a particular Benefit Program including, attaining a specified age, getting married, or ceasing to be a student; or

(v)   a change in employment status of the Participant's Spouse which results in a loss of coverage under the Spouse's plan.

(b)   QMCSOs.  The Administrator shall be permitted to modify a Participant's election to provide coverage under an accident or health plan for a child who is a dependent of the Participant if a judgment decree or order resulting from divorce, legal separation, annulment or change in legal custody (including a QMCSO) requires coverage for the child.  A Participant shall be permitted to revoke his or her election for the Plan Year and make a new election to provide for or cancel coverage for the child if the order requires the spouse, former spouse or other individual to provide coverage for the child.  The Administrator, in its sole discretion, shall determine whether the order qualifies as a QMCSO in accordance with procedures established for such purpose.  The Participant's new election shall take effect as of the effective date provided in the QMCSO Procedures established by the Administrator.

(c)   FMLA Leave.  A Participant taking an FMLA leave may revoke an existing election for the remaining portion of the Plan Year.  Employees on FMLA leave shall have the right to enroll in the Plan or change their election while they are on leave in the same manner as active Employees, rather than having to wait until returning to work.  These rights shall be in addition to any right to change an election under paragraphs (a) through (b) above.

(d)   Special Enrollment.  Subject to the provisions of an underlying Benefit Program that is subject to HIPAA, elections made to add health coverage for a newborn or newly adopted Dependent child pursuant to a HIPAA special enrollment right may be retroactive to the date of birth, adoption, or placement for adoption, if enrollment occurs within 31 days of the date of birth, adoption, or placement for adoption.  In the case of the Participant's marriage, the modified elections shall be effective no later than the first day of the first calendar month beginning after the date on which the Administrator receives the timely completed Election Form, unless the Benefit Program permits the Participant to elect coverage retroactive to his or her date of marriage and the Participant pays his or her share of the cost of coverage with after-tax dollars.

(e)   Procedure for Modifying Election.  A Participant shall make election changes under this Section by following the enrollment process within 31 days (or such

longer time as the Administrator may allow) after the date of the applicable event described in the applicable subsection.

(f)     Effective Date of Modified Election.  Except as provided below, a Participant's election changes pursuant to this Section and new contribution levels shall become effective as soon as administratively feasible after the Employee files his or her election with the Administrator.

**2.3     Termination of Coverage.**  Coverage for an individual under this Plan as a Participant or Dependent shall terminate as set forth in the Benefit Programs, except to the extent otherwise specifically provided herein.  The coverage for an Eligible Employee who is on an approved leave of absence from the Company shall terminate as set forth in the Benefit Programs, except to the extent otherwise specifically provided in the Company's leave of absence policy.  The inadvertent continuation of contributions by or on behalf of a Participant or Dependent after the Participant's or Dependent's termination of participation in the Plan shall not be deemed to constitute a continuation of entitlement to the benefits provided by the Plan.  Upon the discovery that contributions by or on behalf of a Participant or Dependent have been made erroneously, the Administrator shall promptly refund the erroneous contributions.

**2.4     COBRA.**  Notwithstanding any provision in Section 2.3 or the Benefit Programs to the contrary, upon the occurrence of a Qualifying Event a Participant or Dependent who has health coverage under the Plan may become a COBRA Participant and elect to continue his health coverage under the Plan by completing a COBRA election form, returning it to the Administrator within 60 days of the later of the date the individual would otherwise lose such coverage under the Plan or the date of the notice of COBRA rights to the individual and paying the appropriate COBRA premium within 45 days of the COBRA election.  A newborn child or a child placed for adoption with a COBRA Participant may also become a COBRA Participant to the extent required by Code section 4980B(g)(1)(A).  A COBRA Participant's benefits shall be determined in accordance with the provisions of the Benefit Programs.  COBRA coverage will be provided in accordance with the provisions of the Code and the regulations promulgated thereunder and will terminate on the earliest permissible date specified therein.

**2.5     Continuation of Coverage During FMLA.**  For the purposes of this Plan, a Participant who is entitled to take a leave of absence pursuant to FMLA ("FMLA Leave") shall not be considered to have terminated from employment or failed to meet the eligibility requirements of Section 2.1 by virtue of the fact that the Participant has taken an FMLA Leave. The Participant must continue to pay required contributions to the Plan during the FMLA Leave.  If the Participant fails to pay required contributions to the Plan within 31 days after they are due and fails to make alternative arrangements with the Administrator to pay the required contributions, the Participant will no longer be eligible for participation in the Plan during the FMLA Leave.

If a Participant elects to continue his health plan coverage while on an unpaid FMLA Leave, the Participant may (1) pre-pay the entire cost of such coverage for the portion of the leave period during the Plan Year in which the leave begins or (2) may pay for coverage on the same schedule as if he were not on leave, as provided under the terms of the Benefit Programs.  If a Participant elects to continue his health plan coverage while on a paid FMLA Leave, the Participant shall continue to pay his share of the cost of such coverage under the Plan through the existing compensation reduction agreement.

The Company retains the right to recover any contributions that the Participant fails to pay during the FMLA Leave unless the Participant fails to return to work because of:

    (a)    the continuation, recurrence or onset of a serious health condition affecting either the Participant or an immediate family member that would entitle the Participant to take an FMLA Leave; or

    (b)    other circumstances that are beyond the control of the Participant as determined by the Administrator in its sole discretion.

    **2.6**    *Military Leave.*  A Participant who is absent from employment by reason of service in the uniformed services, as that term is described in USERRA, shall be entitled to elect to continue health care coverage under the Plan to the extent required by and subject to the conditions of USERRA.  A Participant who leaves work for service in the uniformed services shall be entitled to resume coverage under the Plan upon reemployment to the extent required by and subject to the conditions of USERRA.

## ARTICLE 3
### BENEFITS

**3.1** *Coverage.* The coverage options available under the Plan are set forth in the Benefit Programs. A Participant shall only be eligible for those benefits to which he is entitled under the terms of the Benefit Programs.

**3.2** *Contributions.* Any Eligible Employee contributions will be made through payroll deductions. Contributions by COBRA Participants and Participants on approved leaves of absence from the Company shall be paid to the Company in accordance with such rules as may be established by the Administrator. Eligible Employee contributions and contributions by COBRA Participants and Participants on a leave of absence covered by the FMLA or USERRA shall be applied to provide benefits before the application of any Company contributions.

**3.3** *Payment to Benefit Providers.* Contributions shall be paid by the Company to Benefit Providers in accordance with applicable Contracts. Any Eligible Employee contributions and contributions by COBRA Participants and Participants on a leave of absence covered by the FMLA or USERRA will be forwarded by the Company to the Benefit Providers in accordance with applicable Contracts or will be used to offset benefit payments.

**3.4** *Source of Payment.* Benefits under the Plan shall be paid from the general assets of the Company or through third-party insurance arrangements as determined in the discretion of the Company.

**3.5** *Coordination of Benefits. General Rules.* If a Participant or Dependent becomes eligible for Medicare, the medical benefits payable under the Plan shall be coordinated with the benefits payable under Medicare in accordance with the provisions of the Benefit Programs and applicable law. If a Participant, Dependent or COBRA Participant has coverage under the Plan and under another health (except a Beaulieu plan), medical, hospitalization, dental, vision, or pharmacy plan or other program, other than Medicare, the benefits payable under the Plan shall be coordinated with the benefits payable under such other plan or program in accordance with the provisions of the Benefit Programs.

**(b)** *Rules Pertaining to Medicaid Recipients.* Notwithstanding any provision of this Plan to the contrary, the following provisions shall apply to any individual covered by this Plan:

**(i)** Payments with respect to benefits hereunder will be made in accordance with any assignment of rights made by or on behalf of such individual as required by a State plan for medical assistance approved under Title XIX of the Social Security Act pursuant to Section 1912(a)(1)(A) of such Act (as in effect on August 10, 1993).

**(ii)** In enrolling an otherwise eligible individual for coverage under this Plan or in determining or making payments for benefits to an individual covered by this Plan, the fact that such individual is eligible for or is provided medical assistance under a State plan for medical assistance approved under Title XIX of the Social Security Act shall not be taken into account.

(iii)    To the extent payment has been made under a State plan for medical assistance approved under Title XIX of the Social Security Act in any case in which the Plan has a legal liability to make payment for items or services constituting such assistance, payment for benefits under the Plan shall be made in accordance with any State law providing that the State has acquired the rights with respect to a Participant to such payment for such items or services.

# ARTICLE 4
## ADMINISTRATION OF THE PLAN

    **4.1**    *Administrator*.  The Administrator shall be the named fiduciary with the sole responsibility for the administration of the Plan.  The Administrator may delegate to any person or entity any powers or duties of the Administrator under the Plan.  In addition, as set forth in the applicable Contracts, the Administrator hereby delegates to the Benefit Providers certain responsibilities related to the payment of benefits and the processing of claims, including but not limited to administration of the claims procedure set forth in Section 4.9.  To the extent of any such delegation, the delegate shall become a fiduciary of the Plan if the delegate is a fiduciary by reason of the delegation, and references herein to the Administrator shall include the delegate.  Any action by the Company assigning any administrative responsibilities to specific persons who are also directors, officers or employees of the Company shall not constitute delegation of the Administrator's responsibilities but rather shall be treated as the manner in which the Company has determined internally to discharge such responsibilities.

    **4.2**    *Powers and Duties of Administrator*.  Except for the functions reserved under the Plan to the Company, the administration of the Plan shall be under the supervision of the Administrator.  It shall be a principal duty of the Administrator to see that the Plan is carried out in accordance with its terms for the exclusive benefit of persons entitled to participate in the Plan without discrimination among them.  The Administrator shall have the sole discretionary authority to interpret the terms and intent of the Plan and to decide all matters arising thereunder, including issues or fact and matters relating to eligibility for benefits.  The Administrator's powers shall include, but not be limited to, the following:

        (a)    To make and enforce such rules and regulations as the Administrator deems necessary or proper for the efficient administration of the Plan;

        (b)    To construe and interpret the terms and intent of the Plan, decide questions of eligibility of any person to participate in the Plan and determine the amount, manner and time of payments of any benefits payable under the Plan, such interpretation to be final and conclusive on all persons claiming benefits under the Plan;

        (c)    To prepare and file such reports as may be required by the Code or ERISA or otherwise as required by law from time to time;

        (d)    To allocate and delegate its responsibilities under the Plan and to designate other persons to carry out any of its responsibilities under the Plan, including legal, administrative, accounting and actuarial counsel, any such allocation, delegation or designation to be in writing;

        (e)    To establish the method of accounting for the Plan and to maintain the accounts;

        (f)    To prescribe any forms as it deems necessary or desirable for the efficient administration of the Plan; and

(g)     To take such actions (with the consent and at the direction of the Company) as it considers necessary or appropriate to satisfy any nondiscrimination requirements of the Code that are applicable to the Plan.

**4.3     *Examination of Records.*** The Administrator will make available to each Participant and Dependent such records under the Plan as pertain to him for examination at reasonable times during normal business hours.

**4.4     *Nondiscriminatory Exercise of Authority.*** Whenever, in the administration of the Plan, any discretionary action by the Administrator is required, the Administrator shall exercise its authority in a nondiscriminatory manner.

**4.5     *Reliance on Tables, etc.*** In administering the Plan, the Administrator shall be entitled to the extent permitted by law to rely exclusively on all tables, valuations, certificates, opinions and reports which are furnished by accountants, counsel or other experts employed or engaged by the Administrator.

**4.6     *Compensation of Administrator.*** All usual and reasonable expenses of the Administrator shall be paid by the Company. In the event the Company is serving as the Administrator, the Company shall serve without compensation for services rendered in such capacity. Furthermore, no employee of the Company shall receive any compensation with respect to services hereunder except as such person may be entitled to benefits under the Plan.

**4.7     *Bonding.*** Unless required by federal or state law, the Administrator shall not be required to give any bond or other security in any jurisdiction in connection with the administration of the Plan.

**4.8     *Payment of Administrative Expenses.*** All reasonable expenses incurred in administering the Plan, other than under a Contract, shall be paid by the Company. Administrative expenses incurred under a Contract shall be paid by application of Company, Participant and other contributions with respect to the Contract.

**4.9     *Claims Procedure.*** The Administrator shall establish reasonable claims procedures as required by ERISA Section 503. The claims procedures established by the Administrator for each Benefit Program are here by incorporated by reference. Any suit for benefits must be brought within one year after the date of any final denial of a claim. In addition, any suit for benefits must be brought within two years after the date the service or treatment was rendered.

**4.10     *Qualified Medical Child Support Orders.*** Upon receipt of a medical child support order, the Administrator, in accordance with written procedures it has established, will determine if the order is a Qualified Medical Child Support Order ("QMCSO") within the meaning of ERISA section 609. Benefits under the Plan will be provided to or on behalf of any child of a Participant whom the Administrator recognizes as having a right to coverage under the Plan pursuant to a QMCSO.

**4.11     *Funding Policy.*** The Plan's funding policy and method are to provide benefits through self-insurance and the purchase of insurance coverage, as applicable, and as further described herein and in the Benefit Programs.

**4.12     *Indemnification of Certain Fiduciaries.*** Each individual who both is an employee, officer or director of the Company and is a fiduciary with respect to the Plan by virtue of serving, individually or with others, as an Administrator or the delegate of a fiduciary function of an

Administrator shall be indemnified by the Company against expenses (other than amounts paid in settlement to which the Company does not consent) reasonably incurred by him in connection with any action to which he may be a party by reason of his fiduciary role with respect to the Plan, except in relation to matters as to which he shall be adjudged in such action to be personally guilty of negligence or willful misconduct in the performance of his duties. The foregoing right to indemnification shall be in addition to such other rights that the individual may enjoy as a matter of law or by reason of insurance coverage of any kind. Rights granted hereunder shall be in addition to and not in lieu of any rights to indemnification to which the individual may be entitled pursuant to the articles of incorporation or by-laws of the Company.

        **4.13** *Erroneous Payments.* In the event that a Benefit Provider inadvertently authorizes any payment to or on behalf of any Participant or Dependent that is not within the scope of the Plan, the Benefit Provider may request the return thereof and/or, in the case of an overpayment to a Participant or Dependent, may reduce or offset any future payments otherwise due to the Participant in question as necessary to recoup the overpayment. If a Participant or Dependent receives benefits from the Plan, directly or indirectly, and the payment of the benefit is not within the scope of the Plan, such Participant or Dependent shall reimburse the Plan for such erroneous payment.

        **4.14** *Subrogation and Reimbursement.* (a) If a Participant is injured or has an illness that was caused or resulted from the actions of another person, the Plan is entitled to be reimbursed in full for all amounts paid on behalf of the Participant. In this regard, the Plan is subrogated to any Participant's legal or equitable rights to recover any monies from such third party. This means that if the Participant receives any compensation or benefits from or on behalf of the third person (whether or not the Participant is made whole), which are in any way connected to the actions which caused the illness or injury, the Plan must be reimbursed from that compensation or benefits before anyone else is paid including the Participant, his/her attorney, or any other provider. This right to reimbursement extends to lawsuits, settlements, payments from insurance companies, or any other source from which the Participant receives compensation or benefits. The Plan's rights under this section shall be enforced through any means allowed by law that ensures enforcement of this provision, including but not limited to, the creation of a constructive trust in favor of the Plan as sole beneficiary on any compensation or benefits recovered from a third party, the placement of a lien or an equitable lien by agreement on any amounts payable to the Participant by a third party, in which case the Plan shall have the superior priority interest, the deduction of the Participant's wages, if applicable, and the reduction in present or future Plan benefits, if applicable.

The Plan's right to subrogation or reimbursement will not be affected or reduced by the "make whole" doctrine, the "fund" doctrine, the "common fund" doctrine, comparative/contributory negligence, "collateral source" rule, "attorney's fund" doctrine, regulatory diligence or any other equitable defenses that may affect the Program's right to subrogation or reimbursement.

The Plan may require the Participant (and his or her attorney, if applicable) to sign a subrogation/reimbursement agreement that confirms the prior acceptance of the Plan's subrogation rights and the Plans' right to be reimbursed for expenses arising from circumstances that entitle the Participant to any payment, amount or recovery from a third party.

Participants must give the Plan information and assistance and sign necessary

papers to enforce our rights under this provision. If this is not done or if a Participant settles any claim without our written consent, the Plan will be entitled to recover from the Participant, and from any settlement or other funds received by the Participant from a third party, all payments for medical, dental and STD expenses made by the Plan, plus reasonable and necessary attorneys' fees and court costs in trying to recover the payments.

Participants must reimburse the Plan from amount of money recovered through judgment or settlement from their own insurance and/or from the third party (or his insurance), up to the amount of benefits provided by the Plan.

Acceptance of benefits from the Plan by a Participant or a Participant's Dependent constitutes the Participant's or Dependent's agreement to the Plan's reimbursement and subrogation rights, and to a constructive trust and equitable lien on any amounts received by the Participant or Dependent from a third party as a result of circumstances related to the illness or injury for which benefits were paid by the Plan.

(b)    Separate and apart from the Plan's right of subrogation and recovery above, the Participant agrees to reimburse the Plan up to the amount of benefits the Medical Plan, Dental Plan or Short Term Disability Plan has provided from any settlement, judgment, or other payment received by the Participant or the Participant's Dependent for medical, dental and STD expenses. If the Participant does not reimburse the Plan, the Participant will be responsible for reimbursing the Plan the amount provided the Dependent. In addition, the Plan, or its designee, may withhold or offset future benefit payments, sue to recover such amounts, or may use any other lawful remedy to recoup any such amounts.

(c)    If any error is made in administering benefits under the Medical Plan, the Dental Plan or the Short Term Disability Plan the Plan may provide additional benefits to, or recover any overpayments from, any person, insurance company, or plan. No error may be used by a Participant to demand benefits greater than those otherwise due under this Plan. The Participant agrees to assist the Plan in enforcing its rights under this provision by signing or delivering necessary papers.

**4.15**    *No Assignment of Benefits.*  No Participant or Dependent may assign, pledge, encumber or otherwise alienate any legal or beneficial interest in benefits under the Plan, and any attempt to do so will be void.  The payment of benefits directly to a health care provider, if any, shall be done as a convenience to the Participant or Dependent and shall not constitute an assignment of benefits under the Plan.

## ARTICLE 5
### AMENDMENT AND TERMINATION

5.1 *Amendment of Plan.* The Company reserves the right at any time or times to amend the provisions of the Plan to any extent and in any manner that it may deem advisable, by a written instrument signed by an officer of the Company or by resolution of the Company's Board of Directors, provided, however, that no such modification shall divest a Participant or Dependent of benefits under the Plan to which he has become entitled before the effective date of the amendment. The Company may delegate to any person or entity, including any officer or employee of the Company, the power to amend the Plan.

5.2 *Termination of Plan.* The Company has established the Plan with the intention and expectation that it will be continued indefinitely, but the Company has no obligation whatsoever to maintain the Plan in whole or in part for any given length of time and may terminate the Plan in whole or in part by a written instrument signed by an officer of the Company at any time without liability, provided, however, that such termination shall not divest a Participant or Dependent of benefits under the Plan to which he has become entitled. Notwithstanding the foregoing, the Plan will terminate on the first to occur of the following:

    (i)    the date it is terminated by that Company;

    (ii)    the date that Company is judicially declared bankrupt or insolvent; or

    (iii)    the dissolution, merger, consolidation or reorganization of the Company, or the sale by the Company of all or substantially all of its assets, except that, subject to the provisions of Section 5.3 and with the consent of the Company, arrangements may be made whereby the Plan will be continued by any successor to the Company or any purchaser of all or substantially all of the Company's assets, in which case the successor or purchaser will be substituted for the Company under the Plan.

The Company may terminate any Benefit Program, and the Company may terminate any Benefit Program as applied to all or any group of its employees.

5.3 *Effective Date of Amendment or Termination.* Any amendment or termination of the Plan shall be effective as of the date determined by the Company or, with respect to amendment of the Plan, shall be effective as of the date determined by any person or entity to whom the Company has delegated authority to amend the Plan.

# ARTICLE 6
## MISCELLANEOUS

**6.1** *Limitation of Rights.* Neither the establishment of the Plan nor any amendment thereof will be construed as giving to any Participant or other person any legal or equitable rights against the Administrator or the Company, except as expressly provided herein and by applicable law.

**6.2** *Information to be Furnished.* Participants shall provide the Company and the Administrator with such information and evidence and shall sign such documents as may reasonably be requested from time to time for the purpose of administration of the Plan, and the Administrator shall be entitled to the extent permitted by law to rely on all such information. All communications in connection with the Plan made by an Employee shall become effective only when duly executed in writing and filed with the Administrator.

**6.3** *Non-alienation of Benefits.* Except as otherwise provided under the Plan or the Benefit Programs, no benefit under the Plan shall be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance or charge, and any attempt to do so shall be void. No benefit under the Plan shall in any manner be liable for or subject to the debts, contracts, liabilities, engagements or torts of any person. If any person entitled to benefits under the Plan becomes bankrupt or attempts to anticipate, alienate, sell, transfer, assign, pledge, encumber or charge any benefit under the Plan or if any attempt is made to subject any such benefit to the debts, contracts, liabilities, engagements or torts of the person entitled to any such benefit, except as specifically provided in the Plan, then such benefit shall cease and terminate in the discretion of the Administrator, and the Administrator may hold or apply the same or any part thereof for or to the benefit of any Dependent or beneficiary of such person in such manner and proportions as the Administrator may deem proper.

**6.4** *Payments to Beneficiary.* Any benefits otherwise available or payable to a Participant following the date of death of such Participant shall be paid in accordance with the applicable Benefit Program, or if payment upon death is not described, then to his spouse or, if there is no surviving spouse, to his estate.

**6.5** *Plan Not a Contract of Employment.* The maintenance of this Plan shall not constitute a contract of employment and does not assure the continued employment of any Employee for any period of time.

**6.6** *Addresses, Notice, Wavier of Notice.* Each Participant must file with the Administrator, in writing, his post office address and any change of post office address. Any communication, statement or notice addressed to such Participant at his last post office address filed with the Administrator will be binding upon the Participant for all purposes of the Plan, and neither the Administrator nor the Company shall be obliged to search for or ascertain the whereabouts of any Participant.

**6.7** *Severability.* The provisions of the Plan are severable. If any provision of the Plan is deemed legally or factually invalid or unenforceable to any extent or in any application, then the remainder of the provision and the Plan, except to such extent or in such application, shall not be affected, and each and every provision of the Plan shall be valid and enforceable to the fullest extent and in the broadest application permitted by law.

**6.8** *Headings.* The headings of the Plan are inserted for convenience of reference only and shall have no effect upon the meaning of the provisions hereof.

**6.9** *Lost Distributees.* Any benefit payable hereunder shall be deemed forfeited if the Benefit Provider is unable to locate the Participant to whom payment is due, provided that such benefit shall be reinstated if a claim is made by the Participant for the forfeited benefit within two years of the date the expense was incurred.

**6.10** *Proof of Claim.* As a condition of receiving benefits under the Plan, a Participant shall be required to submit whatever proof the Benefit Provider may require, within the time frame specified by the Benefit Provider.

**6.11** *Governing Law.* This Plan shall be construed according to the laws of the State of Georgia to the extent not preempted by federal law. Furthermore, any Contract with a Benefit Provider shall comply with the terms of the law of any State in which benefits are to be provided to the extent such State law is not preempted by federal law.

**6.12** *Gender and Number.* Masculine pronouns include the feminine as well as the neuter gender, and the singular shall include the plural unless indicated otherwise by the context.

**6.13** *Payment for Benefit of Incompetent.* In the event any Participant who is entitled to receive benefit payments hereunder is incompetent, the Benefit Provider may pay the same to the legal representative of such incompetent individual who may apply such payments for the benefit of the incompetent.

**6.14** *Provisions of Plan to Control.* In the event of any conflict between the terms of the Plan as set forth herein and in any description of the Plan furnished to Participants or others, the Plan as set forth herein shall control.

## ARTICLE 7
## HIPAA PRIVACY

  **7.1** *General.* The Company has elected to treat the Plan as a Hybrid Entity within the meaning of HIPAA and the regulations issued thereunder (referred to herein as the "Privacy Rule"). The Health Care Components of the Plan identified and designated in Section 7.2 below are subject to this Article 7 and shall comply with the standards for privacy of individually identifiable health information as set forth in the Privacy Rule.

  **7.2** *Definitions.* The following words and phrases, with the initial letter of each word capitalized, shall have the meanings indicated below for purposes of this Article 7.

    (a) "Health Care Component," as defined under 45 C.F.R. § 164.103, shall mean a component or combination of components of a hybrid entity designated by the hybrid entity in accordance with 45 C.F.R. § 105(a)(2)(iii)(C).  The Company has designated the Benefit Programs of the Plan which provide medical and/or dental benefits as Health Care Components subject to this Article 7.

    (b) "Health Care Operations," as defined under 45 C.F.R. § 160.501, shall mean any of the following activities to the extent that they are related to a HIPAA Health Plan's covered functions:

      (i) Conducting quality assessment and improvement activities; population-based activities related to health improvement, reduction of health care costs, case management and care coordination; contacting health care providers and patients regarding treatment alternatives; and related functions that do not include treatment;

      (ii) Reviewing competence or qualifications of health care professionals and evaluating provider and HIPAA Health Plan performance;

      (iii) Underwriting and other activities that relate to the creation, renewal, or replacement of a contract of health insurance or health benefits, and ceding, securing or placing a contract for reinsurance of risk relating to claims for health care (including stop-loss insurance);

      (iv) Conducting or arranging for medical review, legal services, and auditing functions, including fraud and abuse detection and compliance programs;

      (v) Business planning and development, such as cost-management and planning-related analysis related to managing and operating the HIPAA Health Plan, and development or improvement of coverage policies; and

      (vi) Business management and general administrative activities, including, but not limited to: (i) management activities related to implementation of and compliance with the requirements of the Privacy Rule; (ii) customer service, including the provision of data analyses for the HIPAA Health Plan sponsor, provided that PHI is not disclosed to the HIPAA Health Plan sponsor; (iii) resolution of internal grievances; (iv) due diligence related to the sale, transfer, merger, or consolidation of all or part of a

HIPAA Health Plan with another entity directly regulated under the Privacy Rule, or an entity that, following such activity, will be subject to the Privacy Rule; and (v) consistent with applicable requirements of the Privacy Rule, creating de-identified information, as defined in 45 C.F.R. § 164.514(b)(2), or a limited data set, as defined under 45 C.F.R. § 164.514(d)(2).

(c)     "Health Plan" shall mean each "group health plan," as defined in 45 C.F.R. § 160.103, sponsored by the Company to provide health care benefits for Company employees, former employees, and dependents, including the designated Health Care Components.

(d)     "HIPAA Health Plan," as defined under 45 C.F.R. § 160.103, shall mean an individual or group plan that provides, or pays the cost of, medical care, and includes those plans and arrangements listed in 45 C.F.R. § 160.103.

(e)     "Hybrid Entity," as defined under 45 C.F.R. § 164.103, shall mean a single legal entity that is a covered entity whose business activities include both covered and non-covered functions, and that designates health care components in accordance with 45 C.F.R. § 164.105(a)(2)(iii)(C).

(f)     "Payment," as defined under 45 C.F.R. § 160.501, shall mean activities undertaken by a HIPAA Health Plan to obtain contributions or to determine or fulfill its responsibility for coverage and provision of benefits, or to obtain or provide reimbursement for the provision of health care. Such activities include, but are not limited to:

(i)     Determinations of eligibility or coverage (including coordination of benefits or the determination of cost sharing amounts), and adjudication or subrogation of health benefit claims;

(ii)    Risk adjusting amounts due based on enrollee health status and demographic characteristics;

(iii)   Billing, claims management, collection activities, obtaining payment under a contract for reinsurance (including stop-loss insurance and excess of loss insurance), and related health care data processing;

(iv)    Review of health care services with respect to medical necessity, coverage under a health plan, appropriateness of care, or justification of charges;

(v)     Utilization review activities, including precertification and preauthorization of services, and concurrent and retrospective review of services; and

(vi)    Disclosure to consumer reporting agencies of necessary information relating to collection of premiums or reimbursement.

(g)     "Privacy Policy" shall mean the Beaulieu Group, LLC Employee Welfare Benefits Plan HIPAA Privacy Policy.

(h)     "Protected Health Information" or "PHI" shall mean individually identifiable health information that (1) relates to the past, present, or future physical or mental condition of a current or former Participant, provision of health care to a Participant, or payment for such health care; (2) can either identify the Participant, or there is a reasonable basis to believe the information can be used to identify the Participant; and (3) is received or created by or on behalf of a Health Plan.

(i)     "Responsible Employee" shall mean an employee (including a contract, temporary, or leased employee) of the Health Plans or of the Company whose duties (1) require that the employee have access to PHI for purposes of Health Plan Payment or Health Care Operations, or (2) make it likely that he or she will receive or have access to PHI. Persons designated as Responsible Employees are described in Section 7.3. Responsible Employee shall also include any other employee (other than a designated Responsible Employee) who creates or receives PHI on behalf of a Health Plan, even though his or her duties do not (or are not expected to) include creating or receiving PHI. Responsible Employees are within the Company's HIPAA firewall when they perform Health Plan functions.

**7.3     *Responsible Employees*.** Only Responsible Employees shall be permitted to use, disclose, create, receive, access, maintain, or transmit PHI on behalf of a Health Plan.  The use or disclosure of PHI by Responsible Employees shall be restricted to the Health Plan administration functions that the Company performs on behalf of a Health Plan, pursuant to Section 7.4.

(a)     Company employees who perform the following functions on behalf of the Health Plans are Responsible Employees:

(i)     Health Plan vendor relations functions;

(ii)     benefits education and information functions;

(iii)     legal department activities;

(iv)     information systems support activities; and

(v)     human resources functions.

(b)     In addition to those individuals described in Section 7.3(a) above, senior benefits level employees who perform claims appeals and other decision-making functions on behalf of the Health Plans, the Health Plans' HIPAA privacy officer, and Company employees to whom the Health Plans' HIPAA privacy officer has delegated any of the following responsibilities shall also be Responsible Employees:

(i)     implementation, interpretation, and amendment of the Privacy Policy;

(ii)     Privacy Rule training for Company employees;

(iii)     investigation of and response to complaints by Participants an employees;

(iv)    preparation and maintenance of the Health Care Components' privacy notice;

(v)    distribution of the Health Care Components' privacy notice;

(vi)    response to requests by Participants to inspect or copy PHI;

(vii)    response to requests by Participants to restrict the use or disclosure of their PHI;

(viii)    response to requests by Participants to receive communications of their PHI by alternate means or in an alternate manner;

(ix)    amendment and response to requests to amend Participants' PHI;

(x)    response to requests by Participants for an accounting of disclosures of their PHI;

(xi)    response to requests for information by the Department of Health and Human Services;

(xii)    approval of disclosures to law enforcement or to the military for government purposes;

(xiii)    maintenance of records and other documentation required by the Privacy Rule;

(xiv)    negotiation of Privacy Rule provisions and/or reasonable security provisions into contracts with third party service providers;

(xv)    maintenance of Health Plan PHI security documentation; or

(xvi)    approval of access to PHI stored in electronic form.

**7.4**    *Permitted Uses and Disclosures.*  Responsible Employees may access, request, receive, use, disclose, create, and/or transmit PHI only to perform certain permitted and required functions on behalf of Health Care Components, consistent with the Privacy Policy. This includes:

(i)    uses and disclosures for the Health Care Components' own Payment and Health Care Operations functions;

(ii)    uses and disclosures for another Health Plan's Payment and Health Care Operations functions;

(iii)    disclosures to a health care provider, as defined under 45 C.F.R. § 160.103, for the health care provider's treatment activities;

(iv)    disclosures to the Company, acting in its role as Plan sponsor, (1) of summary health information for purposes of obtaining health insurance coverage or premium bids for the Health Care Components or for making decisions to modify, amend, or terminate the Health Care Components, or (2) of enrollment or disenrollment information;

(v)      disclosures of a Participant's PHI to the Participant or his or her personal representative, as defined under 45 C.F.R. § 164.502(g);

(vi)      disclosures to a HIPAA Health Plan for the other HIPAA Health Plan's Payment or Health Care Operations activities;

(vii)      disclosures to a Participant's family members or friends involved in the Participant's health care or payment for the Participant's health care, or to notify a Participant's family in the event of an emergency or disaster relief situation;

(viii)      uses and disclosures to comply with workers' compensation laws;

(ix)      uses and disclosures for legal and law enforcement purposes, such as to comply with a court order;

(x)      disclosures to the Secretary of Health and Human Services to demonstrate the Health Care Components' compliance with the Privacy Rule;

(xi)      uses and disclosures for other governmental purposes, such as for national security purposes;

(xii)      uses and disclosures for certain health and safety purposes, such as to prevent or lessen a threat to public health, to report suspected cases of abuse, neglect, or domestic violence, or relating to a claim for public benefits or services;

(xiii)      uses and disclosures to identify a decedent or cause of death, or for tissue donation purposes;

(xiv)      uses and disclosures required by other applicable laws; and

(xv)      uses and disclosures pursuant to the Participant's authorization that satisfies the requirements of 45 C.F.R. § 164.508.

**7.5**     *Certification Requirement.* The Health Care Components shall disclose PHI to Responsible Employees only upon receipt of a certification by the Company that the Company agrees:

(i)      not to use or further disclose PHI other than as permitted or required by this Article 7 and the Privacy Policy or as required by law;

(ii)      to take reasonable steps to ensure that any agents, including subcontractors, to whom the Company provides PHI received from the Health Care Components agree to the same restrictions and conditions that apply to the Company with respect to such PHI;

(iii)      not to use or disclose PHI for employment-related actions and decisions or in connection with any other benefit or employee benefit plan of the Company other than another Health Plan;

(iv)    to report to the Health Care Components any use or disclosure of PHI that is inconsistent with the uses or disclosures described in Section 7.4 of which the Company becomes aware;

(v)    to make available PHI for inspection and copying in accordance with 45 § C.F.R. 164.524;

(vi)    to make available PHI for amendment, and to incorporate any amendments to PHI in accordance with 45 C.F.R. § 164.526;

(vii)    to make available PHI required to provide an accounting of disclosures in accordance with 45 C.F.R. § 164.528;

(viii)    to make its internal practices, books, and records relating to the use and disclosure of PHI received on behalf of the Health Care Components available to the Secretary of Health and Human Services for purposes of determining compliance by the Health Care Components with the Privacy Rule;

(ix)    if feasible, to return or destroy all PHI received from the Health Care Components that the Company still maintains in any form and retain no copies of such PHI when no longer needed for the purpose for which disclosure was made, except that, if such return or destruction is not feasible, limit further uses and disclosures to those purposes that make the return or destruction of PHI infeasible; and

(x)    to take reasonable steps to ensure that there is adequate separation between the Health Care Components and the Company's activities in its role as Plan sponsor and employer.

7.6    **_Mitigation._**  In the event of noncompliance with any of the provisions set forth in this Article 7:

(i)    the HIPAA privacy officer shall address any complaint promptly and confidentially. The HIPAA privacy officer first will investigate the complaint and document his or her investigation efforts and findings.

(ii)    if PHI has been used or disclosed in violation of the Privacy Policy or inconsistent with this Article 7, the HIPAA privacy officer shall take immediate steps to mitigate any harm caused by the violation and to minimize the possibility that such a violation will recur.

(iii)    if a Responsible Employee or other Company employee is found to have violated the Privacy Policy, such personnel shall be subject to disciplinary action up to and including termination.

IN WITNESS WHEREOF, the Company has caused this Plan to be executed by its duly authorized officer as of December ___, 2007.

BEAULIEU GROUP, LLC

By: _____

Title: _CEO / PRESIDENT_____

Attest _____

BEAULIEU TRUCKING, LLC

By: _____

Title: _Vice President_____

Attest _____

**Exhibit 1**

**BEAULIEU GROUP, LLC
EMPLOYEE WELFARE BENEFIT PLAN
BENEFIT PROGRAMS**

The Benefit Programs consists of the following:

      Beaulieu Group, LLC Medical Plan

      Beaulieu Group, LLC Dental Plan

      Beaulieu Group, LLC Basic Life and AD&D Plan

      Beaulieu Group, LLC Supplemental Life Plan

      Beaulieu Group, LLC Long-Term Disability Plan

      Beaulieu Group, LLC Short-Term Disability Plan

# AMENDMENT 2007-1

## TO THE

## BEAULIEU GROUP, LLC
## EMPLOYEE WELFARE BENEFITS PLAN

WHEREAS, Beaulieu Group, LLC (the "Company") has established the Beaulieu Group, LLC Employee Welfare Benefits Plan (the "Plan"); and

WHEREAS, pursuant to Section 5.1 of the Plan, any officer of the Company has the authority to amend the Plan; and

WHEREAS, the Company desires to amend the Plan to permit non-employee members of the Company's Board of Managers to purchase medical and dental coverage under the Plan on behalf of themselves and their dependents;

NOW, THEREFORE, BE IT RESOLVED, that the Plan is hereby amended as follows:

1.     Section 1.10 of the Plan is hereby amended by adding a sentence at the end thereof to read as follows:

> "Where required by the context, the term "Eligible Employee" shall include a non-employee member of the Company's Board of Managers.

2.     Section 1.14 of the Plan is hereby amended by adding a sentence at the end thereof to read as follows:

> "A non-employee member of the Company's Board of Managers shall be a "Participant" only with respect to medical, health, hospitalization, dental, vision and pharmacy benefits under a Benefit Program."

3.     To effect the foregoing amendment, the terms "you," "employee" and "eligible employee" as used in the Summary Plan Description for the Company's Medical and Dental Plans (which is incorporated into the Plan by reference) shall be construed to include non-employee members of the Company's Board of Managers.

4.     Non-employee members of the Company's Board of Managers will be required to make the same contributions for coverage as similarly situated active employees and the value of the Company contribution toward such coverage will taxed to the Board member.

5.     The amendments contained herein shall be effective June 20, 2007.

1-PH/2683295.1

herein, the undersigned has executed this instrument this 20th day of
_____ JUNE _____, 2007.

By: _____

Title: _CE0/ PRESIDENT_____

**Beaulieu Group, LLC Employee Welfare Benefits Plan**
**As Amended and Restated Effective January 1, 2007**

WHEREAS, Beaulieu Group, LLC (the "Company") has established the Beaulieu Group, LLC Employee Welfare Benefits Plan (the "Plan") to provide benefits for its eligible employees and their dependents; and

WHEREAS, pursuant to Section 5.1 of the Plan, any officer of the Company has the authority to amend the Plan; and

WHEREAS, the Company desires to amend and restate the Plan in its entirety to give effect to prior amendments, to update the Plan for recent changes in federal law and regulations thereunder and to reflect current administrative practice;

NOW, THEREFORE, BE IT RESOLVED, that the Company hereby adopts Beaulieu Group, LLC Employee Welfare Benefits Plan, as Amended and Restated Effective January 1, 2007, as attached hereto as Exhibit A.

Date: 6/27/07

Beaulieu Group, LLC

By: _____

Its: CEO / President

1-PH/2631360.1

**Beaulieu Group, LLC Employee Welfare Benefits Plan**
**As Amended and Restated Effective January 1, 2007**

WHEREAS, Beaulieu Group, LLC (the "Company") has established the Beaulieu Group, LLC Employee Welfare Benefits Plan (the "Plan") to provide benefits for its eligible employees and their dependents; and

WHEREAS, pursuant to Section 5.1 of the Plan, any officer of the Company has the authority to amend the Plan; and

WHEREAS, the Company desires to amend and restate the Plan in its entirety to give effect to prior amendments, to update the Plan for recent changes in federal law and regulations thereunder and to reflect current administrative practice;

NOW, THEREFORE, BE IT RESOLVED, that the Company hereby adopts Beaulieu Group, LLC Employee Welfare Benefits Plan, as Amended and Restated Effective January 1, 2007, as attached hereto as Exhibit A.

Date: 6/27/07

Beaulieu Group, LLC

By: _____

Its: CEO /President

**Beaulieu Group, LLC Employee Welfare Benefits Plan**
**As Amended and Restated Effective January 1, 2007**

**WHEREAS**, Beaulieu Group, LLC (the "Company") has established the Beaulieu Group, LLC Employee Welfare Benefits Plan (the "Plan") to provide benefits for its eligible employees and their dependents; and

**WHEREAS**, pursuant to Section 5.1 of the Plan, any officer of the Company has the authority to amend the Plan; and

**WHEREAS**, the Company desires to amend and restate the Plan in its entirety to give effect to prior amendments, to update the Plan for recent changes in federal law and regulations thereunder and to reflect current administrative practice;

**NOW, THEREFORE, BE IT RESOLVED**, that the Company hereby adopts Beaulieu Group, LLC Employee Welfare Benefits Plan, as Amended and Restated Effective January 1, 2007, as attached hereto as Exhibit A.

Date: 6/27/07

Beaulieu Group, LLC

By: _____

Its: CEO / President

**AMENDMENT 2007-1**

**TO THE**

**BEAULIEU GROUP, LLC**
**EMPLOYEE WELFARE BENEFITS PLAN**

WHEREAS, Beaulieu Group, LLC (the "Company") has established the Beaulieu Group, LLC Employee Welfare Benefits Plan (the "Plan"); and

WHEREAS, pursuant to Section 5.1 of the Plan, any officer of the Company has the authority to amend the Plan; and

WHEREAS, the Company desires to amend the Plan to permit non-employee members of the Company's Board of Managers to purchase medical and dental coverage under the Plan on behalf of themselves and their dependents;

NOW, THEREFORE, BE IT RESOLVED, that the Plan is hereby amended as follows:

1.       Section 1.10 of the Plan is hereby amended by adding a sentence at the end thereof to read as follows:

   "Where required by the context, the term "Eligible Employee" shall include a non-employee member of the Company's Board of Managers.

2.       Section 1.14 of the Plan is hereby amended by adding a sentence at the end thereof to read as follows:

   "A non-employee member of the Company's Board of Managers shall be a "Participant" only with respect to medical, health, hospitalization, dental, vision and pharmacy benefits under a Benefit Program."

3.       To effect the foregoing amendment, the terms "you," "employee" and "eligible employee" as used in the Summary Plan Description for the Company's Medical and Dental Plans (which is incorporated into the Plan by reference) shall be construed to include non-employee members of the Company's Board of Managers.

4.       Non-employee members of the Company's Board of Managers will be required to make the same contributions for coverage as similarly situated active employees and the value of the Company contribution toward such coverage will taxed to the Board member.

5.       The amendments contained herein shall be effective June 20, 2007.

1-PH/2683295.1

# EXHIBIT "3"

## IN THE SUPERIOR COURT OF WHITFIELD COUNTY
## STATE OF GEORGIA

| | | |
|---|---|---|
| CARTERSVILLE MEDICAL CENTER, LLC, DOCTORS HOSPITAL OF AUGUSTA, LLC, PARKRIDGE MEDICAL CENTER, INC. and REDMOND PARK HOSPITAL, LLC | ) ) ) ) ) | |
| Plaintiffs, | ) ) | CIVIL ACTION NUMBER 15CI951-B |
| v. | ) ) | |
| BEAULIEU GROUP, LLC | ) ) | |
| Defendant. | ) ) ) | |

## NOTICE TO THE SUPERIOR COURT OF WHITFIELD COUNTY, STATE <u>OF</u> <u>GEORGIA, OF REMOVAL TO FEDERAL COURT</u>

TO THE HONORABLE COURT:

PLEASE TAKE NOTICE THAT, pursuant to 28 U.S.C. §§ 1441 and 1446, Defendant Beaulieu Group, LLC ("Beaulieu") filed removal papers with the Clerk of the United States District Court for the Northern District of Georgia, Rome Division, regarding the above-styled action. A copy of the Notice of Removal to Federal Court (with its accompanying exhibits) is attached hereto as **Exhibit 1**. Defendant respectfully requests that the Superior Court of Whitfield County, State of Georgia proceed no further in this action unless and until such time as the action may be remanded by order of the United States District Court for the Northern District of Georgia, Rome Division.

Respectfully submitted, this the 11th day of August, 2015.

BAKER DONELSON BEARMAN
CALDWELL & BERKOWITZ, PC

Steven G. Hall
Georgia Bar No. 319308
Robert G. Brazier
Georgia bar No. 078918
*Counsel for Defendant*

Monarch Plaza, Suite 1600
3414 Peachtree Road, N.E.
Atlanta, Georgia  30326
Telephone:  404.577.6000
Facsimile:  404.221.6501

## CERTIFICATE OF SERVICE

This will certify service of a copy of the foregoing **NOTICE TO THE SUPERIOR COURT OF WHITFIELD COUNTY, STATE OF GEORGIA OF REMOVAL TO FEDERAL COURT** was served on all counsel of record by U.S. First Class Mail to the following::

Christopher P. Twyman
**Cox, Byington, Brumlow & Twyman, LLP.**
711 Broad Street,
Rome, Georgia 30161

David A. King
Kinika Young
Alison K Grippo
**Bass, Berrry & Sims, PLC**
150 Third Avenue Sourth, Suite 2800
Nashville, TN 37201

*Counsel for Plaintiffs*

This 11th day of August, 2015.

**BAKER DONELSON BEARMAN
CALDWELL & BERKOWITZ, PC**

Steven G. Hall
Georgia Bar No. 319308
*Counsel for Defendant*

Monarch Plaza, Suite 1600
3414 Peachtree Road, N.E.
Atlanta, Georgia  30326
Telephone:  404.577.6000
Facsimile:  404.221.6501

3